2011-14-82 Midwestern Pet against Society Produce. Good morning. May it please the Court, I'm Tim Pesini from Blank Rome and I appear before the Court today on behalf of the appellant and applicant in this case, Midwestern Pet Foods. The issues before the Court this morning are two. One, whether the Trademark Trial and Appeal Board abused its discretion in allowing the admission of certain evidence that the appellee improperly failed to produce in the course of the discovery or which predated the date of Midwestern Pet Foods' intent to use application. And two, whether the Trademark Trial and Appeal Board committed reversible error in finding a likelihood of confusion between the appellant's and appellee's marks. If it's okay, I'll start with the second issue first because I think, frankly, it's the more important one of the two. The Board's finding of similarity constitutes reversible error. When compared in their entireties, no reasonable consumer would confuse wagon strips and begging strips. Ultimately, the mark that the appellee has is begging strips and it's the colloquial and taking off the G, it's begging and it's applied for wagging and did it in sort of the same colloquial way by removing the G and putting an apostrophe. So we're talking about wagon versus begging. The Board essentially accepted Nestle's argument that the gin or the gin part or the strips portions of the marks apparently, although undoubtedly weak, were the principal and most dominant portions of the mark. But they also relied on the fact that both marks described dog behavior, right? They did. And to be honest, Your Honor, I don't know where that comes from in the law. To me, it's sophisticated at its most. I mean, there's no suggestion that I can see, certainly not in DuPont, that would suggest that two people are not entitled to certain types of They're completely different. Now, of course, dogs can do both, but they could also bark. They can also sleep. They can also lie. And there's a million things that the animal can do. But to suggest that because they somehow relate to dog behavior and that they are then they're sort of confusingly similar, I just don't see any basis for it. I mean, I think that's clearly what the Board said here. It seemed to me that what the Board was saying is that they call to mind a similar image. I mean, if you had, for example, a smiling cat cat food and grinning cat cat food, grinning and smiling are very different English words, but they call to mind the same image in the purchaser's head. And Your Honor, I would think that's a perfectly legitimate basis on which to adjudge the distance between the two marks, wouldn't you? I would, if in fact that's what the marks were. And here the idea is that wagging and begging, maybe not as close as grinning and smiling, but still call to mind the same enthusiastic response of the dog. Well, I suppose there is enthusiasm, I suspect, but I don't think they call to mind all the same thing. I mean, begging, in fact, and for many pet owners, is not something that's a favorable trait. You know, when a dog sits and begs at the table trying to get food, most people would suggest that begging is not a favorable trait for a dog. You know, wagging, I think everyone realizes that that's a happy dog. So I don't think that those terms in any way are similes or metaphors for one another. I think they're quite different. And I think, you know, just plain English and plain common sense says that these words are entirely different. Moreover, if you look at the product that Nestle has, the Appley, it's a strip and it looks like a piece of bacon. And in fact, they play up the double entendre of begging. And so when they say it very quickly, and in fact, if the court were to look at the YouTube stories that they've talked about in the evidence, they say it very quickly. The dog's almost psychotic, going crazy for these bacon-flavored strips. And they say bacon, bacon, bacon so many times, it sounds like bacon. And it's clearly a double entendre. There's no such thing here with the applicant. There's no double entendre for wagon. And in fact, it's quite different. And so, you know, there's certainly testimony from Nestle's witness that they intended both impressions, both bacon and also begging. And so I suggest that, you know, the board completely missed this issue. And very importantly, this is the very first step in the DuPont analysis. And I don't know that you need to go further. The marks really just are completely different. Strips is generic. It's been disclaimed in both cases. There's a number of pieces of evidence that are put in the record that strips has been disclaimed and is sold by, you know, various competitors of the parties. And so I don't think anyone suggests that strips has any commercial impression whatsoever. I'm not suggesting, of course, that it needs to be taken out of the analysis. But ultimately, beg, wag, completely different English words, completely different understandings. There were some examples cited by counsel in their brief, and there was some discussion of the board saying there's one or two letters difference, and that's the only difference. Well, I don't dispute that. But those two letters or those one letter, I mean, that's the difference in the details. I mean, changing the word from tomb to bomb. I mean, there's one difference, but I think everyone understands the difference between a tomb and a bomb. I think everyone here understands the difference between beg and wag. What's the significance that there wasn't any survey evidence here to show actual confusion when people were presented with the two marks? Well, I mean, it wasn't really addressed here. And I don't know that there is an obligation on the part of a party who's trying to prove famousness to have a survey. It certainly would have been probative. I'm not really asking about the survey in relation to the strength of the mark or the fame of the mark. I'm really asking about a survey where there are facial differences of this sort. What's what significance should we attach to the fact that there wasn't a survey about likelihood of consumer confusion between wagon and beggin? I suspect, Your Honor, really, ideally, I think the parties would probably love to have had one. I think all it probably does is suggest the commercial value of the dispute between between the parties. I mean, obviously, Nestle is a massive company that could have, I'm sure, afforded to do one. They either chose not to do one or I guess what I'm asking is, is what is the law about the significance or are there circumstances in which you must have a survey to establish consumer confusion? What's the law about that? I believe the law does not require a survey. I mean, there's been some dicta and there's been some inferences and a number of that suggests that perhaps, particularly in the instance of a well-heeled party, that they really ought to put one on. I think there certainly are there is case law that suggests that if one party puts one on and the other party doesn't, that certain inferences can be drawn there. But I don't believe that there is, nor do I think, frankly, that there should be an absolute requirement that a party put on that kind of effort. Maybe not an absolute requirement, but where it's otherwise a close case, can a party lose because it doesn't put on a survey? It's certainly possible. I mean, I think when you don't have any, you know, when there's nothing you can actually point to physically to say here's confusion or not, the court is like the board was put in a position of just sort of looking at the facts and drawing, you know, the law. Seems to invite speculation by the board or by us as to whether there is really a likelihood of confusion. I think it's a fair comment. I think it's a fair comment. Beyond sort of the principal part of beg and wag being really very, very different, there's the whole discussion that the board gets into as to whether wagon strips or whether, I'm sorry, is strong mark and entitled to a broad range of protection. The board, there was a suggestion that this was a famous mark and Nestle made that assertion in the course of the opposition. The board didn't find there to be sufficient evidence to establish that it was a famous mark and I suggest the board was correct there. But where the board seems to have lost its way in the course of the analysis is that, you know, they look at the evidence that Nestle put into consideration as to whether or not the mark was strong or not and although they found it wasn't famous, they found it was strong and entitled to broad protection. Nestle understandably makes light of the board's finding that the proffered evidence of inconsistencies wasn't especially probative and lacked context and in fact was contradictory to their sworn responses in discovery. In discovery, they said that they had sold hundreds of thousands of dollars of the product. When they actually produced stuff at trial, it turns out to be millions. They never explained that inconsistency. They also said in the sworn response to the interrogatories that they'd conducted thousands of dollars of advertising. Yet then when it comes to trial, it's, you know, significantly larger. They also don't provide any context for this evidence and so I'd suggest to the court that the board's finding that this mark is strong is just not founded by what's there. In fact, the board completely ignores going into the analysis of deciding on the Abercrombie test, you know, what kind of a mark is this? Is it inherently a strong mark? Is it fanciful or arbitrary? It's obviously not fanciful or arbitrary. I'd suggest to the court it's a common low-level suggestive mark because even as the appellee suggests, it's getting a characteristic for what the dog will do when given the treat. It'll beg. So that's, I think, a classic suggestive mark, which is inherently registrable, but I think it's a broad level of protection. When you look at the evidence that's been put in, you know, the court, the TTAB, didn't talk about sales. They didn't talk about advertising. They didn't talk about, you know, any of the common things that courts typically look to to establish strong, enforceable mark. You know, they had 36,000 hits on a website for YouTube for these commercials. And of course, that was in 2008. The application was filed in 2003. There's no context to suggest that those 36,000 hits translated into any sort of goodwill or understanding that the mark functions as a trademark. And really, the rest of it has to do primarily with their sponsorship of a parade in St. Louis. Again, I suggest to you, and the board, frankly, had it right when they when they initially said that Nestle's evidence suffers from inconsistency and is not especially probative and lacks context. And so how from that decision or that statement, they were able to then conclude that this was a strong mark. I just don't think it's there. And so I think the board's subsequent finding is it should be reversed. You're into your rebuttal. Would you like to save it? I will. Very well. Mr. Polson. Thank you, Your Honor. Tom Polson for Nestle. Thank you, Your Honor. I'm sorry. We feel this is a rather straightforward case, believe the Trademark Trial and Appeal Board got it right. And I want to, if I can, focus on focus us back on the core of the issue here. Why wasn't there a consumer survey? I mean, it would seem that something like that would be useful here, dealing with likelihood of confusion, to do a survey in which the marks were presented to consumers and see if they confused it to it. Sure. Absolutely. And of course, surveys can be helpful in any case where likelihood of confusion is an issue. In part, I think counsel had it right that both parties would probably have loved to have a survey and more particularly one that was favorable to their position. Why didn't you do a survey? This is an intent to use trademark application. Frankly, I'm not sure why we're here given that. If the issue was use in the marketplace, I think surveys have more value. To be candid, Your Honor, given all of the DuPont factors pointing, we believe squarely in our favor. We didn't think we needed one. Why shouldn't we say that your failure to do one should be held against you? Because we believe each and every DuPont factor is squarely, each and every relevant DuPont factor, some aren't relevant here since there's no use of the market issue, are squarely in Nestle's favor. That would be my response. So, you know, the applicant, appellant goes through a tortured dissection of the mark and would like this court at the Trademark Trial and Appeal Board to focus on two letters of this 13 character mark. And really, we can't escape the fact that the mark that was applied for is wagon strips. It wasn't wag, it wasn't wag, the marks aren't wagon and wagon, they aren't wagon strips is extremely common, right? Of course. And the gin thing is common also. So in terms of the marketplace, the only real difference is one is wag and one is big. Well, if we do want to take apart the mark and dissect it, we can focus one at a time on different syllables and we can look at the register and at the marketplace and try and determine how individual components, whether they're common or not. And in fact, the appellant relied on the National Data Corp, this court's National Data Corp case for the position that the Trademark Trial and Appeal Board didn't give enough weight to BE and WA. But of course, if you read that entire case, you know, that the court said, we have to look at the marks in their entireties, even disclaimed subject matter, like the word strips, even descriptive subject matter. But in determining the likelihood of confusion in the marketplace, if the second part of the mark is commonly used, it's not likely that the second part of the mark is going to cause consumer confusion. And that relates to the likelihood of confusion with respect to the overall mark, doesn't it? Well, clearly distinctiveness of individual terms needs to be taken into account, but the marks as a whole need to be considered when we're looking at likelihood of confusion. The marks at issue are Began strips and Wagon strips. And there are no other, you know, although the appellant provided a lengthy list of third-party marks in an effort to show how common certain portions of the marks are, there are no other marks on the register. And the register is all that's at issue here when we're talking about an intent to use application right now. There are no other marks on the register that have the letter string G, G, I, N, apostrophe, strips, none. And in fact, many of the marks that were cited by the, we would submit that none of the third-party marks cited by the applicant are anywhere near as close to Began strips as Wagon strips is. So with regard to the DuPont factors, you know, again, we think that the core issue here and really the most important issue is similarity of the marks. I agree with counsel on that point. Again, each mark contains precisely 13 characters. 11 are identical. Both marks, as the board said, have the same format, structure, and syntax. Both have three syllables, two of which are identical. And again, although the applicant, because it's all it has, would like us to go through a tortured dissection and focus on two letters, the applicant did not apply to register WA or WAG or WAGON. The marks are WAGON strips and BEGAN strips. And another point that I think is very important to bring up, as this court noted in the Century 21 case some 20 years ago, you know, the applicant doesn't dispute the fact that the parties' respective goods are identical, the channels of trade are identical, the purchases are identical, the conditions of purchase are identical. And when you have those circumstances, although we don't think we need it in this case, less similarity is required to find a likelihood of confusion. You know, the fact that Appellant says that we don't need to go further into the quant factors is because we, for that reason, all of those are squarely in our favor and it's not disputed. With respect to the strength of the mark, Your Honors, counsel questions whether the board made the right decision in determining that the mark was strong. Clearly, the board did find some inconsistencies in evidence. Was it at least hundreds of thousands of dollars of sales or was it millions of dollars of sales, et cetera? And frankly, we believe that's probably why the board didn't conclude that the mark was indeed famous. But despite some inconsistencies, the board noted that we have a mark here in Begenstrips that's been in continuous use for over 20 years. Sales throughout the United States during that period, a wide range of nationally circulated print advertising, television media, the web, and significantly, I think, unsolicited media coverage. Counsel raises the point that Nestle's mark, Begenstrips, creates a double entendre. We agree. We think that's part of the allure of the mark. That's something that makes a mark inherently distinctive and does make it a strong mark. So we would submit that after weighing all of the evidence that was submitted on the issue of strength and fame of the mark, fame for purposes of likelihood of confusion, that is, despite some inconsistencies, the board certainly made a supportive decision that the Begenstrips mark is strong and entitled to a wide scope of protection. Could I turn you for a minute to the discovery issue? Yes, Your Honor. And I'm having difficulty in understanding how having objected to the production of certain material that you can then go ahead and introduce it into evidence at trial without having provided it in the discovery. Yes, Your Honor. The board concluded that Nestle provided proper notice of its evidence during discovery. We agreed to produce documents at a mutually agreeable time. How did you provide notice when you refused to produce the documents? Well, in each case, we agreed to produce documents at a mutually convenient time and place. An applicant never took us up on that invitation. Yeah, but you objected to the production of at least some of these documents, right? In some cases, we objected. So, if they'd shown up, you wouldn't have produced them because you objected. With respect to those that we raised objections to, the board concluded that the objections were proper and applicant never took the opportunity to test the sufficiency of the final nomenclature that we had. Well, whether the objections were proper or not, how can you object to, you know, on grounds that certain documents are covered by privilege and then use the documents at trial? How could you do that? Without producing them during the discovery period? Well, many of the objections we raised, Your Honor, for example, in one case was a technical one. They exceeded the number of interrogatories permitted. But that was eventually resolved by a submission of a new set of interrogatories. Right. And the objection, other objections, continued. In other cases, when we objected to the nature of the discovery request, we invited the applicant to provide narrower requests, for example. And I'm not talking about the number here, but the scope of the request. They never took us up on that. There was never a motion to compel file. Discovery closed and an applicant decided not to participate. Well, maybe so, but why can't they assume that if you were withholding documents in discovery, based on objection, that you're not going to use them at trial? Well, I think the board correctly concluded that with one exception, none of our objections misled the applicant into believing that no documents existed, simply that their requests were improper. The one, the one. But you're not answering my question. I mean, how can it be that you object to the production of documents, withhold them during discovery, and then say, ah, we've changed our minds. We're going to produce them and use them at trial. That seems like sandbag. Well, respectfully, Your Honor, we disagree. And had, had, and if counsel disagreed with us, they had the opportunity to challenge that. They did challenge the admission, the use of the documents at trial, didn't they? They successfully challenged one. The board struck it from the record, and we haven't appealed that. But they raised the issue at the trial. They said, you can't use these documents because you didn't produce them in discovery. Correct? They did raise that. Yeah. You're talking about at the Trademark Trial and Appeal Board? Yeah. Right. They, they did that. And the, and the board reviewed our responses and concluded that our objections were well taken. They were proper. And the applicant, if they disagreed with them, had the opportunity to voice that. They never contacted us. Other than, with respect to the, the documents that were at issue, as to which you had objected to production, but later introduced documents falling within the scope of the requests, setting aside those objections that were for overly broad requests, lack of specificity, whatever, that kind of objection, what other objections did you make with respect to those, those particular documentary requests as to documents that you later introduced at trial? Candidly, Your Honor, I don't know if, I don't know what specific documents are at issue here that we produced. Well, where I'm trying to go here is you say, well, one category of your objections was that they just weren't specific enough to broad. Okay. But to get to the core of what Judge Dyke is asking, I think, is did you have any documents that were admitted at trial, which you said, we're not going to produce these documents because, for example, they're privileged? None that I can recall at this time, Your Honor. Not a breadth objection, but a specific objection to production of that particular document on the basis of privilege or some other grounds. Yeah, I can't recall specific documents at this time. I'm sure counsel would agree. Was there a privilege law? Pardon? Was there a privilege law? There were privileged documents that would have been logged, yes, relating to sales and so forth. But were all documents, you claim privilege as part of the objection to the production of this category of documents, right? Yes. Was there a privilege law that supposedly listed all privileged documents? I believe there was, Your Honor.  I don't recall. I'm sorry. Was there any document as to what you claim privilege that was introduced at trial? I don't recall specifically, Your Honor. I'm not trying to be evasive. I just, I don't recall. Were there objections other than privilege and breadth? I mentioned already exceeding the number and so forth. That was rectified later, and then we provided other objections in the subsequent request that were made. But no. I mean, those were the general nature of them were, you know, either we'll produce documents or... But wasn't there a relevancy objection to the production? Sure. In some cases, for example, there were, there was evidence that related strictly to use in the marketplace. So how, you know, if the, what was the basis for withholding the documents that were ultimately used at trial? Was it on grounds of relevancy? Was it on grounds of relevance? Well, yes, Your Honor. An example of that would be the applicant's attempt to bring in evidence of what house marks Purina or Nestle now uses on their packaging, what marks the applicant would use should they bring this mark into actual use. We considered those kinds of things. That would be an example of evidence that was irrelevant. And that you ultimately used at trial. One reason that we brought up at trial was to go to the issue of intent. And that is the applicant had attempted to introduce some evidence and we did object on the issue of relevancy. So the answer is you objected on relevancy to certain documents and then used those same documents at trial. After the applicant brought them in, in a giant poster board in front of the trademark trial and appeal board. What brought them in? What brought them in? No, no. I'm talking about, I'm using the same example. There was a group of evidence we objected to that related to what the packaging might look like if applicant would apply their house mark along with the wagon strips mark. And similarly, Nestle would use its house mark, a red and white checkerboard, for example, or the Purina mark in association with its wagon strips mark. The idea being there's other things on the package that will avoid confusion. I'm getting confused. There were documents, there was a relevancy objection. There were some documents that were withheld on relevancy grants. When you went to the trial, did you introduce those documents? I'm sorry, Your Honor. I misunderstood. I'm talking about evidence that the applicant brought in. We don't care about that right now. You made a relevancy objection to production of documents. Were documents that were covered by that relevancy objection ultimately used by you at the trial? I don't recall specifically what documents there may have been, Your Honor. I don't... I don't know. You understand the difficulty of saying at discovery that something's irrelevant and then suddenly at trial it becomes relevant. I understand. Assuming that nothing has happened in the interim, such as the introduction of the other I understand, Your Honor. But you don't know whether that happened. No, I don't. Again, after making these objections, the applicant never tested the sufficiency of those things, never objected or never filed a motion to compel, never tried to respond to our objections by, for example, narrowing the scope of a request to drive the question into something that was relevant. Okay. Very well. We'll hear rebuttal. With respect to the issue we've just been talking about, to be honest, it really goes to fundamental fairness. There's not a trial court in America that would permit the submission of documents that were requested during discovery and not produced. Well, but let's be really specific here. What was it, setting aside objections based on breadth of the inquiry, was there any material that was objected to based on either relevance or privilege that was introduced by the opposing party? Almost all of it in its entirety. They produced, we sought sales information with respect to the mark so that we could do some form of intelligent analysis as to whether or not they had much commercial strength or not. They objected based on relevance and based on privilege, which, of course, as we all know, the Board has a standing order, which ultimately there was one entered in this matter anyhow. So it's not a well-founded objection to say privilege or confidential nature of business numbers. The Board has a standing order just to avoid this very same thing. It's clearly a case of sandbagging, as Your Honor said. They absolutely produced all this stuff. They produced sales. Produced, you mean they introduced. They introduced it at trial during testimony, notwithstanding the fact that we did it. Now, look, why didn't we file a motion to compel? Well, as a practical matter, why would we? It was their burden to establish that they pleaded they had a famous mark. And they told us in their discovery that they had sold a couple hundred thousand dollars worth. I've not seen a single case reported in the United States that suggests that a couple hundred thousand dollars worth of sales is sufficient to rise to the level of a famous mark. Why would we compel something when it's their burden? If they wanted to play games and hide the ball, we were happy to let them do it because, frankly, from our perspective, they weren't making their case. And then to produce it during trial is outrageous. Well, since the Board found that the mark was not famous, how were you prejudiced by this? Well, it appears the Court backed into, that is the Board, backed into that this was a strong mark based on a consideration of that evidence. Now, interestingly, if you read the Board's opinion, and if you read the Appellee's brief, not once do they ever mention a dollar of sales. Not once do they mention any advertising. All they talk about is the Barkas Parade and a couple of other sort of low-level stuff that certainly wouldn't rise to the level of strength. It appears the Board was influenced by that submission, although they don't reference it. I mean, they talk about the inconsistencies and the lack of background for it, but I can't draw any other conclusion but to think that the Board clearly considered that, and it was the very much basis for their finding that it was a strong mark. I just, again, would go back to sort of the initial point. Counsel asked, why are we here? Well, the reason we're here is because our client has spent a lot of time, money, and effort to register this mark, and it's entitled to, as a matter of law, that due course. Okay. Thank you. The case is submitted. We thank both counsel. The Court will take a 10-minute recess for purposes of reconstituting the panel. All rise. The armature will take a short recess.